Good morning your honors. Attorney Daryl Mondew for defendant Michael Barnes. The government responded to my argument that Mr. Barnes was not in custody when he was interrogated by the FBI. Even if he was, he made no omissions prior to being Mirandized. Therefore his statements should not have been. The motion judge was correct in denying the motion to suppress statements and he was under no compulsion through his parole conditions to have to answer the FBI agents anyway. The United States also contends that the evidence was properly admitted at trial and the motion to suppress the tangible evidence was also correctly denied and therefore the evidence went to the jury on weight. And third that the erroneous jury instruction that the jury could consider his silence which the United And even though defense counsel did not object to it, the introduction of that was harmless error because the jurors certainly didn't alter their verdict based on that erroneous instruction. I take it it's your position that the entire statement should be suppressed even the admissions made after he was Mirandized. Correct Your Honor and of course that's based on Missouri v. Siebert which the record reflects that the FBI agents clearly would have arrested him had he not opened up to talk to them. Well let's kind of go back. I know the district court thought this was a close call as indicated and if you divide it into the different periods. So let's take the period before he received his Miranda rights. Is it fair to say that the statement he made prior to the Miranda rights was sort of non-consequential or not that significant? No I think it was significant. So if that were suppressed, I assume that would be your first position is that at a minimum that should be suppressed. Correct. So let's just say we agree with you up to that point. But then they give him his Miranda rights and of course it's open sesame after that and he says many more. He's a little more lugubrious after he waives his Miranda rights. Why then should that portion be suppressed? Well again on Missouri v. Siebert it was because the Miranda warnings were deliberately withheld. I think one of the points to prove that is that they brought a recording of his definitely inculpable. What they said is look we want to get him in there and we want him to cooperate with us so we can get evidence against these other people. We didn't intend to arrest him or charge him and we figured he might just start helping us but when he didn't we wanted to show him that we have the goods. That's all. So at that point in effect they show the goods on the recording and that's when he acknowledges some knowledge of this event. So up to that point they're not planning to arrest him. In fact they don't want to arrest him. They want him to cooperate. But that's not the you are going to interrogate and the person is in custody they must be Mirandized first. The fact that they had no you know ominous result to that questioning such as an arrest doesn't there's no exception to Miranda for that. What would you have us tell law enforcement or the probation officer? In terms of yeah she encouraged him to cooperate correct? She did. And I understand your argument that what that became sort of a compulsion. Correct. Should she have gone on said I want you to cooperate your conditions of parole require you to cooperate but you have a perfect Fifth Amendment right not to say anything. Would you have us tell probation and parole officers that they have to do that? Well certainly what Michael understood his parole conditions to be was to answer truthfully questions and at some point in the record it appears that she parole officer Cukert I think I'm saying that right said that meant FBI as well. If in fact to relate that to the Pesceo case or Pesceo in that case it was found that he had to waive his Fifth Amendment right to silence because of the conditions of probation and parole. Should she have gone and said that he could be silent and I won't arrest you? She has said many times confusing things throughout the record yes no yes no I would have arrested him because they were I would have arrested him on a parole violation because there were new charges going to be filed. So yes to answer your question your honor a parolee in my case and in future cases should be advised that their condition to answer questions is not is subject to their Fifth Amendment right. So that should really I mean if that's the case it ought to be printed into their conditions on sentencing from the district court because otherwise you have haphazard enforcement or advisement by various parole officers right. This case is so convoluted on what parole conditions required that it's hard for me to answer in this case. The case that's definitive for the Ninth Circuit would be Pesceo on that he was required. His requirement to answer his probation or parole officer truthfully resulted in waiving his Fifth Amendment right privilege because of those conditions. In this case parole officer Cukors put Barnes in a situation where on one hand he had to comply with his conditions of probation or face parole violation from I'm just trying to imagine what in your mind would have been the appropriate thing for the pro for her to say the parole officer. I mean if she had said look at your conditions require you to cooperate I want you to cooperate I direct you to cooperate but I want you to know this you also have a Fifth Amendment right not to incriminate yourself but if you exercise that right and remain silent I will arrest you for violating your conditions. Would that have been sufficient? Would that have been sufficient to put him on warning he did not have to speak? Answer? If that precise warning had been given at the get-go would everything he said after that been admissible? And you know what my next question is how is that different from what happened? It is different from what happened first off it was the FBI agents obligations to give him Miranda warnings not his parole officer. But if the parole officer had done it at the get-go does it matter who gives the warning in that situation? I think it would have to be the interrogator I'm not sure that she could. So they would have to in your mind after giving everything that I described then the FBI agents would have to repeat the precise Miranda warnings in order to make admissible what happened thereafter? I'm not sure that parole officer Cukors could give Miranda warnings on the behalf of the FBI. I'm just trying to imagine in your world what would have been necessary for all of these statements to be admissible? That when he first walked into the room and was confronted by two FBI agents that he had no idea were going to be there that he was given Miranda warnings by them immediately. And the parole officer could say nothing? I would assume that whatever she could say would reflect her jurisdiction, her rules and the Alaska code that deals with what he has to do vis-a-vis her not vis-a-vis the FBI. The only distinction that she interjects at some point because she wavers so much on what was required and what wasn't. As a result she doesn't even tell after trial that subsequent counsel got out the standard conditions. That's document 347 on the clerk's docket where he admitted that the standard condition says yes you have to answer parole officer's questions. I can see an argument against that saying well it wasn't the parole officer that was asking the questions. I have a question. In order for the man to be in custody your argument is that he's being compelled to answer questions by the probation officer. Is there any evidence that the federal investigators knew of his requirement to answer questions? Because if they didn't, they hadn't put him under arrest. Did they know he was in custody? His being in custody in his parole officer's office. I mean he's not in custody, he's not compelled to answer, he's not compelled to stay there unless the FBI knows what the Alaska law is as to his probation conditions. It was my argument that he was, when he accompanied parole officer. Your argument is that the minute he walks in then the FBI's got to Mirandize him because they're going to interrogate him. But they don't know he's in custody if they don't know the Alaska parole conditions. But the custodial thing is finding a person in custody is when their personal freedom is restrained and that can be both figuratively and literally and when he went from the outside office of the parole building to her law office. This is where you get into this what falls on the side of the parole officer versus the FBI because the FBI has no idea that maybe normally he checks in at the window. I mean basically they say we want to talk to this guy. They say well we better take him back because we don't you know we want somebody to know he's snitching so we want to have it in a private setting so we take him back. So then the question I guess to you is this notion of custody when somebody is in custody it's a convergence of all the circumstances but in your view does it matter what the parole officer thought and or what the FBI thought? No it's what Mr. Barnes thought. Well that's a subjective. Whether you're in custody is not wholly subjective. Well he was it was involuntary his meeting with the FBI. I mean I think that's a given. He had no clue the FBI was going to be in there. So we under the case law of Bassigdani that was found to be you know not custody because that was voluntary. In Mr. Barnes case it was involuntary and when he was confronted by the FBI in a locked office or a closed room within a locked area of the building she admitted that he was not free to leave. Let me ask you what is there any evidence in the record of his view that if he didn't cooperate with the FBI in other words that he had to answer the questions or that he would get busted on be perfectly honest with that yes but that's a sealed transcript okay it is in the record right all right we've exceeded your time but I will give you a minute for rebuttal thank you good morning your honors I'm Erin Bradley representing the United States on the on behalf of the United States Attorney's Office we welcome you to the District of Alaska. For the Barnes case it's important to note that the district court found that it was not necessary to resolve the issue of whether or not Barnes was in custody because the district court found that there was a timely advisement of Miranda rights. In looking at the record however there is evidence that Mr. Barnes was never in custody. Was he free to leave? Your honor he was free. Can you answer that with a yes or no? He was free to leave nobody had placed him under arrest. If he had said am I free to leave the probation officer would have said sure. In looking at the record the agents told Barnes that they were not going to arrest him they only sought his cooperation it's important to the FBI even contacted Mr. Barnes he had sent a letter to them in December of 2006. I thought the probation officer said that if he had refused to cooperate she would have arrested him. She was going to arrest him for the drug activity she testified a number of times that it's not normally her practice or her office's practice to arrest people for not answering questions truthfully he would have been arrested for the drug activity. He was required to be there is that correct? He was required to meet with his probation officer. Is there a yes or no in your vocabulary? Your honor it's it's not a question that can be answered with a yes or no. He wasn't required to be there? He was required to meet with his probation officer. So he was required to be there? He was required to meet with his probation officer that did not mean that he was of the circumstances that all of the facts. So let's go to the probation conditions. Am I correct that the probation condition was that he needed to promptly and truthfully answer the questions? Your honor that is the case in the Seychelles case which is it's our position that that case can be distinguished from the Barnes case. Barnes conditions only warned him that he was expected to cooperate with law enforcement. He was never told that a failure to respond, cooperate, or be truthful would result in a probation violation. So were his probation conditions more akin to Murphy than to Sechelles? Yes, yes your honor. In Murphy the US Supreme Court found that there was told just as Barnes was that he was expected to cooperate and the Supreme Court found that this was not a requirement of a waiver of the Fifth Amendment right. That Murphy could not have reasonably feared revocation and that his statements were not compelled and Barnes case parallels Murphy and that Barnes was only told he was told only to cooperate. He was never told that he was advised of his Miranda rights before he offered an admission. Of course the one difference there is he's meeting with his probation officer right? Yes your honor. Here we got a couple of FBI guys right there in addition that that gives you a more coercive atmosphere. How does that change it? Mr. Barnes had requested audience with the FBI. He then sent them a letter saying that he had information on another case. The FBI based on their investigation into the drug activity that the case that Mr. Barnes wanted to talk to them about was somebody whose last name was Webster and it involves sex trafficking. And the FBI also had information that Barnes was involved in drug activities and their purpose of meeting with him was not to prosecute him, not to get a statement that could be used against him in prosecution. Their sole purpose was recruitment. They wanted to recruit an informant. They had reason to believe that he had information that could help them build other cases. I'm having trouble with, are you saying there's a difference between the expectation to cooperate under these circumstances when a man is let into a room and a locked door is open and he's sat down and there's a difference between cooperation and talking? Yes your honor there's a difference. You can cooperate by just nodding, right? You can cooperate by just nodding, but they were seeking government informant cooperation. That would be cooperation if he just shook his head and nodded it? That would be cooperation? Or would he be violated right then because he wasn't talking to the FBI? He was never told that a failure to answer these questions would result in a revocation. Cooperate under these circumstances means remaining silent? Cooperation it could mean something different for the parole officer or for the FBI to be able to talk to the FBI. When she's saying cooperate with the FBI does that mean that you can remain mute? Is that your position? No your honor that's not my position. But I think the FBI was seeking specific government informant cooperation. So cooperation as to certain things but not to others? You have to answer certain questions but not others? No your honor. No they were seeking him to work as a government informant because he had contacted them and he had told them that he had information on government cases that were pending and then potential government cases. Were they empowered to give him a grant of immunity? They were not empowered to give him a grant of immunity and in fact they specifically told him that they could not make any promises. They did not mirandize him immediately because they did not want to give him the false impression that he was going to be arrested or that he was under arrest. They were only seeking his work as a government informant. They told him, he asked them, he said am I going to go to jail? And they told him that they had no intention of taking him to jail. They wanted to make it clear to him that he was not in custody. Let's suppose this case had occurred at the FBI office in an interrogation room and the FBI agents had said we know you're involved in some drug trafficking. We don't want to prosecute you. We want you to work as a CI. And a conversation ensued. There was no Miranda warning whatsoever. He gave incriminating statements and those statements were later used against him at trial. Would that be okay? Your Honor, it would be my position or the government's position that he would not be in custody at that time. He was brought in under the guise of the FBI wanting to recruit him as a government informant. And there is one point I need to make on the locked door. Mr. Barnes' counsel has led this court to believe that he could not exit that probation officer's office because the door was locked. But if you look at the record, and it's on pages 433 and 450 of the supplemental excerpt of record, there is testimony that the door was locked from the outside, meaning that members of the public were not free to enter that probation officer's office. But people inside of that office can come out. It's not locked from the inside. It's locked from the outside to keep members of the public out. The agents did not advise Mr. Barnes of his rights immediately because they wanted to make sure that he knew that he was not under arrest. And they thought that Miranda would lead him to believe that he was under arrest. When they finally read him his Miranda rights, he had initially, they asked him about the drug activity, and he was vague. He said things like, I don't know, and I'm not doing anything illegal. And then they played the tape for him, and they actually stopped him in mid-sentence when he wanted to fess up to remembering the involvement with the drug activity. So your position, if I understand it correctly, is they brought out the fact that they had a recording of a conversation which inculpated him, not for the purpose of prosecuting him for drug possession, but for the purpose of having him recruited to be an inside informant. That is correct, Your Honor. Yes. That is exactly our position. And when he did hear the tape and they were careful, it was in Agent Jones' testimony at the evidentiary hearing, the first evidentiary hearing, where he was careful to stop Barnes before he said anything incriminating. And he stopped him and advised him of his Miranda rights at that time. And this is similar to the case, the U.S. Supreme Court case of Minnesota v. Murphy, where the probationer had a requirement to, he was told that he had to be truthful with the probation officer in all manners, and that failure to comply with these conditions, Murphy was informed, could result in his return to the sentencing. And during the course of sex offender treatment, Murphy admitted to a rape and murder from 1970- Ms. Barnes, will you tell me where in the record I can find that the motivation of the FBI in using the recording was not to get him to confess to drug possession, but to intimidate him into a recruitment? Your Honor, they were not trying to intimidate him into working- But Barnes is asking for a record citation. I can give you several, Your Honor. I would look at Supplemental Excerpt of Record 867, 517, these are page numbers, 520, 444, and 542, as well as page 865 from the Supplemental Excerpt of Record. The probation officer had made a decision to arrest Barnes for the drug trafficking activity if he did not cooperate with the FBI, but that was not communicated to Mr. Barnes, and that information can be found on pages 866 and 499 of the Supplemental Excerpt of Record. Can you repeat the citations about the agent's intent to recruit him? I have 444 and 865. Yes, Your Honor. 504, 867, 517, 520, 444, 542- Those are Supplemental Excerpts of Record? Yes, Your Honor, that's the Supplemental Excerpt of Record. These are all S.E.R.? Yes, Your Honor, and I have sites to the Supplemental Excerpt of Record where they talk about the fact that Barnes sent a letter to the FBI indicating that he had information on another case, the Webster case. What's the timing on that? That took place, that letter was sent to the FBI in December of 2006, Your Honor. And then it's in the spring that they have this meet-up in connection with this Hawaii- In fact, at that interview, after Mr. Barnes waived his rights and discussed the drug trafficking activities with Agents Eckstein and Jones, then Special Agent Jolene Bronkhorst and Officer Lenny Torres from the Anchorage Police Department, who were working on the Webster sex trafficking case, they actually met Mr. Barnes and the other agents at the probation officer's office so that Torres and Bronkhorst could discuss the Webster case with Mr. Barnes in response to the letter that Mr. Barnes had sent to them. And references to that letter can be found in the Supplemental Excerpt of Record on pages 439, 477, 513, and 734. Your Honor, if the Court has questions about the timing of the Miranda advisement, the District Court found that this was a timely advisement. Pardon me, Ms. Bradley, is it your position that there was a meeting prior to the meeting at the probation officer's office where there was a person face-to-face attempt to recruit Mr. Barnes? No, Your Honor, the first attempt by the FBI to recruit him was at this meeting that took place on October 31st where he met... At the probation officer's office? Yes, Your Honor. All right. And they brought Agent Bronkhorst and Officer Torres to that meeting in response to Barnes' letter where he had indicated that he had information on the Webster case, which Agent Bronkhorst and Officer Torres were working on. But the Webster case involved non-drug activity, right? It involved... I didn't work on that case, Your Honor. I know that it involved some sex trafficking and there may have been some drug implications. Wait a minute. If you're offering to help on a sex trafficking case, how does that make him a potential recruit for being a C.I. on drug possession? He was a potential recruit for being a C.I. on drug possession because the FBI had information that he knew people who were involved in drug trafficking. He had contact with Mr. Pebinito who was in Hawaii. So they weren't interested in going after Webster. They were interested in going after Pebinito. Well, they were interested in getting information. I believe at that point we had already prosecuted Mr. Pebinito. He had already been charged. But the FBI was looking to get information about other drug traffickers in Anchorage, and they were also interested in what Mr. Barnes had as far as information on the Webster case because on that October 31st meeting, Agents Jones and Eckstein, who were investigating the drug case, they invited Agent Bronkhorst and Officer Torres who were working on the Webster case. They were also invited to meet with Mr. Barnes, and in fact they did. And the interview lasted for a couple of hours to the best of my recollection. Did they meet on the same day? Yes, Your Honor. Everybody met on October 31st of 2007. That was the day that Mr. Barnes had his probation meeting. That was the day that he went back and spoke with Agents Jones and Eckstein who were seeking to recruit him as an informant. And then that same day, Agents Jones and Eckstein, because Mr. Barnes waived his rights and indicated that he wanted to talk to them and they were having a fruitful meeting, Agents Jones and Eckstein invited the Webster investigators to meet. So everything took place on October 31st of 2007. I think the time has expired unless there's further questions. No. Okay. Thank you, Your Honor. Thank you. Is there a clerk down there? We'll put a minute on the clock so she'll have some rebuttal time. Ms. Bondu, let me ask you a question. You can go ahead and get to the podium. If the purpose of playing the recording was to intimidate Barnes into agreeing to be recruited as a confidential informant, that was the purpose, not to get a confession as to drug possession. Does that make any difference? Absolutely not. Why? Because that's not what the purpose was. They're not violating a Fifth Amendment right then. They're not trying to get him to confess to drug possession. They're trying to say, look, we've got the goods on you. You better play on our side. And he bursts out and says, yeah, I was there. I did the drugs or whatever he says. Then they say, well, they're going to change. Now that he's said that, they give him his Miranda warnings and then he goes ahead and tells everything. I think it defies logic that if you're trying to seek cooperation from someone, you are going to accuse them of a federal crime. Really? It's not exactly what you want to do? You want to intimidate them into helping you? But he'd already indicated, according to the United States, by offering letters saying, I'll help. Well, that's Webster. They want to go off on the Hawaii deal. One thing is ratting out a child molester. Another thing is ratting out a drug informant. Well, I'm not certain what Your Honor is asking me. Is it okay to try to use some persuasion of sufficient force to get him to cooperate on drugs? That the facts shake down so that the driver of fact can determine that the purpose of using the recording was not to violate his self-incrimination rights under the Fifth Amendment. The purpose was to recruit him to become an informant. And when he blurted out the truth, then they gave him the Miranda warning as fast as they could. Would that change the facts? I mean, on Cybert, it would, because it wouldn't be a two-step interrogation. It wouldn't be the classic situation of getting a confession without Miranda and saying, now that you confessed, we're going to give you the Miranda warning. Do you want to continue your confession? It wouldn't be the Cybert situation, would it? Maybe not, but I do not believe that's how this court can view what happened. They eventually used what he said to indict him and charge him. They had every intention of putting Mr. Barnes in a position where he was unable to play in the recording of his voice on the phone. Yes, that was intended to elicit an incriminating response. As a matter of fact, the motion judge questioned the agents. Didn't you understand you were going to have him make an incriminating statement by asking that? And what did he answer? I do not recall at the moment, but I'm fairly certain it was something that pleased the judge to where they said that no, they had no intention of doing anything. Whether they were seeking Michael's cooperation on drug activities or Webster, whatever, Miranda doesn't make an exception for cooperation. If you were going to interrogate, which they did. But they weren't interrogating. I mean, take the government's position and tell me that it's wrong. They weren't interrogating when they played the recording. They were trying to intimidate him into cooperation. That's their theory. And the minute he comes out and says something in response to their intimidation, then they say, oh, wait a minute, Miranda. No, I don't think this court can find it was just simply the plane of the tape to intimidate. We're not in the fact finding business. Contrary to what some people say. And that issue is really for the trial judge to see whether the use of the recording was for the purpose of cyber purpose of using a two step interrogation. Or was it for the purpose of intimidating into becoming a CIA? Precisely. But the trial judge didn't reach that. Why? Because number one, Williams had. In Williams, cyber hadn't been decided. So that was remanded for a hearing on whether it was a two step. In this case, the motion judge never got that far because they said, well, you know, even if he was in custody, he made no admissions prior to that. So there was no final. Well, here's what the district court did say, however. Following up on Judge Bay. In this case, the record supports a conclusion that agents did not improperly coerce or induce Mr. Barnes to make inculpatory statements. And then the court goes on to say why, although it was a surprise encounter, the court cannot find that such tactics amount to psychological coercion, as would be necessary to overbury his will, et cetera. So those absent clear error are findings based on the testimony that we have to accept. And unless you can point us to something that would say that was clear error, at least the underpinnings, I'm sure you would agree we would have to accept. Correct? Unless it's clear error. Correct. And I believe the motion judge clearly erred in the findings of fact, that it was that the plane of the recording when Michael denied involvement was designed to elicit an incriminating response, which it did. And then they Mirandized him. And then they did his cooperation. And he discusses everything and anything having to do with drugs in Anchorage. I think we have your argument well in mind. The U.S. attorney gave us some record sites that she particularly thought we should look to to look at this coercion cooperation issue. And if there are any particular record sites that you'd like to draw our attention to, you can take some time afterwards. You don't have to do it now. And leave those with the court or send us a letter just of the record sites. And we'd be happy to also take special note of any record sites that you have. All right. Thank you. Thank both counsel for your argument this morning. The case of United States v. Barnes is submitted.
judges: Hawkins, McKeown, Bea